IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

**UNITED STATES OF AMERICA**

v.                                                            CRIMINAL NO. 2:14-00275

**FREEDOM INDUSTRIES, INC.**

**UNITED STATES MEMORANDUM REGARDING
FACTUAL BASES FOR GUILTY PLEAS OF FREEDOM INDUSTRIES, INC.**

## I.   INTRODUCTION

Defendant Freedom Industries, Inc. ("Freedom") has pleaded guilty to three charges in an information. Count One of the information charged Freedom with negligently discharging a pollutant in violation of 33 U.S.C. §§ 1319(c)(1)(A) and 1311. Count Two charged Freedom with the unlawful discharge of refuse, in violation of the Refuse Act, 33 U.S.C. §§ 407 and 411. Count Three charged Freedom with the knowing violation of a Clean Water Act permit condition, in violation of 33 U.S.C. §§ 1319(c)(2)(A), 1311, and 1318. Counts One and Two are misdemeanor offenses, while Count Three is a felony offense. The United States now submits this memorandum to explain the factual bases for the offenses of conviction.[1]

---

[1] Rule 11 of the Federal Rules of Criminal Procedure requires the Court to determine that there is a factual basis for a guilty

Preliminarily, "[w]hen determining whether a sufficient factual basis exists to support a guilty plea, the question before the court is not whether a jury would, or even would be likely, to convict: it is whether there is enough evidence so that the plea has a rational basis in facts that the defendant concedes or that the government proffers as supported by credible evidence. . . . [T]here must be an admission, colloquy, proffer, or some other basis for thinking that the defendant is at least arguably guilty." United States v. Delgado-Hernandez, 420 F.3d 16, 27 (1st Cir. 2005)(internal quotations and citation omitted). The factual basis requirement is simply designed to protect a defendant by ensuring that he understands the nature of the charge and to ensure that his conduct actually falls within the charge. United States v. Mastrapa, 509 F.3d 652, 660 (4th Cir. 2007).

When determining whether there is a sufficient factual basis for a guilty plea, the Court "need not rely only on the Rule 11 plea colloquy." Id. Rather, the Court may rely on "anything that appears in the record," id., including "the prosecutor's summarization of the plea agreement and the language of the plea agreement itself, a colloquy between the defendant and the district court, and the stipulated facts

---

plea, before the Court enters judgment on the plea. Fed. R. Crim. P. 11(b)(3).

before the district court." United States v. Christenson, 653 F.3d 697, 700 (8th Cir. 2011). Indeed, "the factual basis for certain elements may be inferred from other facts admitted by the defendant or proffered by the government." Delgado-Hernandez, 420 F.3d at 31. In the end, the Court "need only be subjectively satisfied that there is a sufficient factual basis" for a guilty plea. United States v. Ketchum, 550 F.3d 363, 366 (4th Cir. 2008).

Freedom, of course, has pled guilty to criminal charges in connection with its negligent operation of the Etowah Facility and the chemical leak of January 2014. Freedom's negligence included an institutional failure to recognize and appreciate the hazards associated with its storage of MCHM on the riverbank above the Elk River; the failure to formally inspect Tank 396, the tank from which the MCHM leaked; the failure to properly maintain the containment area, in particular the dike wall surrounding the tank farm at the Etowah Facility; the failure to ensure the containment area actually contained a leak; the failure to comply with the requirements of its environmental permit; the failure to properly conduct training of its personnel; and the failure to have adequate spill-prevention materials on hand at the Etowah Facility. See Freedom Stipulation of Facts, pp.3-6 (ECF-9 at 25-28). In the Sections below, this Memorandum recites the specific facts Freedom has

admitted in its Stipulation of Facts (supplemented by additional, uncontested evidence), which provide the factual bases for the guilty pleas.

## II. COUNT ONE – NEGLIGENT DISCHARGE OF POLLUTANT

Freedom pled guilty in Count One to the negligent discharge of a pollutant in violation 33 U.S.C. §§ 1319(c)(1)(A) and 1311. The elements for this offense are: (a) that a pollutant was discharged from a point source into waters of the United States; (b) that the discharge was not authorized by a Clean Water Act permit; and (c) that the defendant's negligence proximately caused the discharge.

The factual basis for Freedom's plea of guilty to Count One may be found in the Stipulation of Facts (Exhibit B to Freedom's plea agreement, ECF-9) and is further supplemented by additional, uncontested evidence, as explained below.

A. Element - A pollutant was discharged from point source[s] into waters of the United States.

Facts

- On January 9, 2014, a chemical leak was discovered at an above-ground storage-tank farm located on the east bank of the Elk River, on Barlow Drive in Charleston, West Virginia, within the Southern District of West Virginia. The tank farm, known as the Etowah River Terminal ("Etowah Facility"), was owned by Freedom. Freedom Stipulation of Facts, p.1 (ECF-9 at 23).

4

- The leak that occurred on January 9, 2014, consisted of a chemical commonly referred to as MCHM.[2] The MCHM leaked from Tank 396 at the Etowah Facility. Id.

- MCHM breached containment, ran down the riverbank and discharged into the Elk River at two discernible, confined and discrete channels or fissures, or "point sources." Id., pp. 1-2 (ECF-9 at 23-24).[3]

- After it leaked from Tank 396, the MCHM was a pollutant as defined in the Clean Water Act, 33 U.S.C. § 1362(6). See id., p.2 (ECF-9 at 24).

- The Elk River was (and is) a navigable water of the United States. Id.; see also U. S. Army Corps of Engineers "Approved Jurisdictional Determination Form" (Exhibit 2) (indicating that the Elk River has been determined to be "waters of the U.S.," from the mouth of the river in Charleston, WV, to mile 139).[4]

---

[2] The term "MCHM" refers to the chemical 4-methylcyclohexane, as Freedom originally purchased it, as well as the substance after Freedom mixed in another chemical known as "PPH." Freedom sold MCHM to coal mining companies as a cleansing agent.

[3] The Clean Water Act defines "point source" as including "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The point sources where the MCHM entered the Elk River from the Etowah Facility are marked on the photograph attached as Exhibit 1.

[4] That part of the element requiring that the pollutant be discharged into "waters of the United States" derives from the definition "discharge of a pollutant," which is defined in the Clean Water Act as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). In turn, the term "navigable waters" is further defined as "the waters of the United States." 33 U.S.C. § 1362(7). The term "waters of the United States" includes interstate waters, waters which have been or may be susceptible to use in interstate commerce, and tributaries of such waters. 33 C.F.R. § 328.3(a)(1).

B.  Element - The discharge was not authorized by a Clean Water Act permit.

Facts

Freedom did not have a permit issued pursuant to the Clean Water Act to discharge MCHM into the Elk River. Freedom Stipulation of Facts, p.3 (ECF-9 at 25); see also DEP Nov. 17, 2009 email (Exhibit 3, labeled WVDEP-16-006680) (authorizing registration of Etowah Facility under NPDES Permit WV0111457 ("NPDES Permit"), and "subject to the monitoring requirements of Sector I-1 of the [NPDES] Permit"); NPDES Permit, p.24 & pp. 12-13 (Exhibit 4)(authorizing discharge of storm water into navigable water, subject to monitoring and reporting requirements for certain pollutants under Sector I-1, but not authorizing discharge of MCHM).[5]

C.  Element - The defendant's negligence proximately caused the discharge.

Facts

- Freedom knew of and should have appreciated the hazards associated with MCHM and the need to take reasonable steps to ensure that MCHM did not spill and leak into the Elk River. Freedom Stipulation of Facts, p.3 (ECF-9 at 25).

- Freedom did not take reasonable steps to ensure that MCHM would not leak and spill into the Elk River. For example, the containment area at the Etowah Facility within which Freedom stored MCHM was incapable of holding a significant

---

[5] The NPDES Permit registration was issued to "Etowah River Terminal LLC," which at all relevant times acted on behalf of and with the intent to benefit Freedom. Freedom Stipulation of Facts, p.2 (ECF-9 at 24).

6

chemical spill. There were numerous cracks in the dike wall. Moreover, at various spots along the dike wall, mortar had eroded between and underneath the blocks, thus creating space for liquid to leak through. Freedom Stipulation of Facts, p.4 (ECF-9 at 26).

- Freedom, through certain of its key personnel, including but not limited to employees and agents, was long aware of these inadequacies in the containment area, and in particular with the dike wall. Nonetheless, Freedom did not repair the dike wall, in particular in areas near Tank 396, the tank containing the MCHM that leaked and was discharged into the Elk River. Freedom failed to make the necessary repairs that would have ensured that the containment area was actually capable of containing a large spill. Id.

- Freedom also failed to inspect and maintain Tank 396, the tank from which the MCHM leaked and spilled into the Elk River. Tank 396 was a riveted tank, a mode of construction that had not been used for above-ground storage tanks for many years. After the owners of Freedom formed ERT and purchased the Etowah Facility in 2001, Freedom made arrangements to have all of the tanks in the facility inspected, except *for* Tank 396 and the two other tanks that were used to store MCHM, Tanks 395 and 397, which were also riveted tanks. Seven years after first taking possession of the Etowah Facility, Freedom espoused a desire to get rid of Tanks 395, 396, and 397, but Freedom nonetheless continued to use them for MCHM storage. And yet Freedom never had the riveted tanks inspected. Id.

- Freedom also failed to develop, maintain, and implement a Storm Water Pollution Prevention Plan ("storm-water plan"). The NPDES Permit, discussed above, required permit-holders such as Freedom to develop and maintain a storm-water plan in accordance with good engineering practices. The NPDES Permit further required that a storm-water plan (i) identify potential sources of pollution that might reasonably be expected to pollute storm water discharges from the Etowah Facility; and (ii) describe and implement practices that would be used to reduce pollutants and to assure compliance with the NPDES Permit terms and conditions. The NPDES Permit also required that the storm water pollution prevention practices be reviewed annually and that the storm-water plan be revised as necessary. Freedom Stipulation of Facts, p.3-4 (ECF-9 at 25-26).

7

- As a result of Freedom's failure to develop and implement a storm-water plan, Freedom failed to implement reasonable practices at the Etowah Facility that would assure compliance with the NPDES Permit and prevent discharges of pollutants into the Elk River. Those practices would have included:

    o Properly analyzing the spill potential of all substances, including MCHM, stored at the Etowah Facility;

    o Ensuring that the area within the dike containment wall would actually hold the contents of the largest tank, without spillage or leaking;

    o Ensuring that periodic inspections were conducted and preventive maintenance performed on facility equipment and systems, including the tanks and dike containment wall, the breakdowns and failures of which might result in discharges of pollutants to nearby surface waters; and

    o Conducting training of all personnel, including responsible corporate officers, to insure that all hands were well aware of the requirements of the storm-water plan and the importance of pollution prevention.

    Freedom Stipulation of Facts, p.5-6 (ECF-9 at 27-28).

- Freedom also failed to have adequate spill prevention material on hand to deal with the significant leak of MCHM on January 9, 2014. The Etowah Facility had on hand a mere two bags of absorbent material and no booms or other materials to stem the flow of MCHM from Tank 396 to the dike wall. Freedom personnel at the Etowah Facility were left to try to staunch the flow of MCHM with a cinder block, which had holes in it. They were unsuccessful. The MCHM flowed, essentially unimpeded, to and then through and under the dike wall, and then into the Elk River. Freedom Stipulation of Facts, p.6 (ECF-9 at 28).

D.   Analysis of Negligence and Proximate Causation.

The standard of negligence required for conviction under the Clean Water Act is ordinary negligence. The government must

8

prove by sufficient evidence that the defendant failed to exercise "the standard of care that a reasonably prudent person would have exercised in a similar situation." United States v. Pruett, 681 F.3d 232, 242 (5th Cir. 2012)(*per curiam*)(citation omitted); United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005) ("an individual violates the CWA by failing to exercise the degree of care that someone of ordinary prudence would have exercised in the same circumstance").

The term "proximate cause defies easy definition and 'must be determined largely from the facts of the particular case.'" Walker v. Griffith, 626 F. Supp. 350, 352 (W.D. Va. 1986) (applying West Virginia law, and noting that West Virginia "does not appear to embrace the notion that proximate cause means immediate cause"). "To prove proximate cause, the government must establish that the harm was a foreseeable result of the conduct." United States v. Hanousek, 176 F.3d 1116, 1123 (9th Cir. 1999). In addition, there may be more than one proximate cause. See, e.g., 3 Fed. Jury Prac. & Instr. § 120:61 (6th ed. 2011).

Here, the facts noted above on pages 6-8, Section II.C of this Memorandum, establish that Freedom acted negligently in operating the Etowah Facility and in its duty not to discharge pollutants into the Elk River. The negligence included the failure to ensure that the containment area would hold the

9

contents of Tank 396 within the dike wall; the failure to inspect Tank 396; the failure to develop and maintain a storm-water plan for the Etowah Facility, and to implement practices that would have been contained in a storm-water plan and that would have assured compliance with the NPDES Permit; and the failure to have adequate spill prevention materials on hand on January 9, 2014, at the Etowah Facility. Freedom's failings in all of these aspects were proximate causes of the spill and resulting discharge of MCHM into the Elk River on January 9, 2014. In sum, the discharge of the MCHM into the Elk River was a direct and reasonably probable consequence of Freedom's negligence. See Freedom Stipulation of Facts, p.6-7 (ECF-9 at 28-29).

### III. COUNT TWO – REFUSE ACT VIOLATION

Freedom pled guilty to Count Two of the information, which charges the unlawful discharging and causing the unlawful discharge of refuse matter in violation of the Refuse Act, 33 U.S.C. §§ 407 and 411. The elements for this offense are: (a) that the defendant[s] discharged or deposited refuse, or caused refuse to be discharged or deposited, into a navigable water of the United States; and (b) that the discharge was not authorized by a permit.

The factual basis for the guilty plea by Freedom to Count Two is as follows:

A. Element – The defendant[s] discharged or deposited refuse, or caused refuse to be discharged or deposited, into a navigable water of the United States.

　1. *Facts about discharge of refuse into navigable waters of the United States.*

The facts listed above on pages 4-5 (Section II.A) of this Memorandum establish that MCHM was discharged from the Etowah Facility (Tank 396), i.e., the shore, into the Elk River, on January 9, 2014. After the MCHM leaked from Tank 396, it was "refuse" for the purposes of the Refuse Act, 33 U.S.C. § 407. Moreover, the Elk River was (and is) a navigable water of the United States. Freedom Stipulation of Facts, p.2, 7 (ECF-9 at 24, 29). See also U. S. Army Corps of Engineers "Approved Jurisdictional Determination Form" (Exhibit 2) at 1 (finding that Elk River qualifies as "'navigable waters of the U.S.' within Rivers and Harbors Act [Refuse Act] jurisdiction").

　2. *Facts – Discharged and caused the discharge*

The Refuse Act, unlike the Clean Water Act violation charged in Counts One, which requires negligent conduct, is a strict-liability statute requiring no particular showing of a state of mind. See, e.g., United States v. White Fuel Corp., 498 F.2d 619, 622-24 (1st Cir. 1974) (holding that no proof of *scienter* was required to sustain Refuse Act conviction); United States v. Ashland Oil Inc., 705 F. Supp. 270, 276 (W.D. Pa. 1989) (violation of Refuse Act is a strict liability crime). Not

11

requiring *scienter* furthers the dominant purpose of the Refuse Act, which is "to require people to exercise whatever diligence they must to keep refuse out of public waters." White Fuel, 498 F.2d at 623. As a result, there is no "generalized 'due care' defense that would allow a polluter to avoid conviction on the ground that he took precautions conforming to industry-wide or commonly accepted standards." Id.

The MCHM that discharged into the Elk River leaked from the Etowah Facility, which Freedom owned. Freedom Stipulation of Facts, p.1 (ECF-9 at 23). These facts are sufficient to establish that Freedom discharged the MCHM for the purposes of the Refuse Act, under strict liability.

Moreover, it can be said that Freedom "caused" the discharge based on the facts listed above on pages 6-8 (Section II.C), and as further explained in Section II.D. Inasmuch as those facts establish the existence of negligence and proximate causation, they are more than sufficient to establish the causation required for the Refuse Act.

B.  Element - The discharge was not authorized by a permit.

   Facts

Freedom did not have a permit issued pursuant to the Clean Water Act to discharge MCHM into the Elk River. Freedom had no permit that would have allowed for the discharge of MCHM into

12

the Elk River. Freedom Stipulation of Facts, p. 3 (ECF-9 at 25).[6]

## IV. COUNT THREE – KNOWING VIOLATION OF PERMIT CONDITION

Freedom pled guilty to Count Three of the information, which charges the knowing violation of a condition of a Clean Water Act permit, in violation of 33 U.S.C. §§ 1319(c)(1)(A), 1311, and 1318. The elements for this offense are: (a) that a violation of a condition of a Clean Water Act permit occurred; (b) that the permit condition implemented sections 1311 or 1318 of Title 33, United States Code; and (c) that the defendant knowingly committed the violation or knowingly caused the violation to be committed.

This particular crime is a felony offense, predicated on "knowledge." In this case, the permit condition that was violated was the requirement in the NPDES Permit that Freedom develop and implement a storm-water plan. Thus, the requisite "knowledge" that the United State must prove is the knowledge by Freedom that there was no such plan for the Etowah Facility.

Freedom, of course, is a corporation. "The acts of a corporation are . . . simply the acts of all of its employees operating within the scope of their employment." United States v. Bank of New England, 821 F.2d 844, 856 (1st Cir. 1987).

---

[6] The Refuse Act allows an exception for permitted discharges, where the U.S. Army Corps of Engineers has issued a permit. Such permits have been incorporated into permits issued under the Clean Water Act. United States v. Hamel, 551 F.2d 107, 111 n.6 (6th Cir. 1977); 33 U.S.C. § 1342(a)(4), (5).

13

Similarly, knowledge acquired by employees in the scope of their employment is imputed to the corporation. Id.; United States v. T.I.M.E.-D.C., Inc., 381 F. Supp. 730, 738 (W.D. Va. 1974). Moreover, a corporation's knowledge is the *collective* knowledge that all of its employees have gained in the scope of their employment. "Corporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components. The aggregate of those components constitutes the corporation's knowledge of a particular operation. It is irrelevant, whether employees administering one component of an operation know the specific activities of employees administering another aspect of the operation." Bank of New England, 821 F.2d at 856. In addition, "knowledge by a corporation, obtained by and through its officers and key employees, of facts of continuing importance to the business of the corporation, even after the termination of services of that officer or employee, is conclusive upon the corporation." ACME Precision Products, Inc. v. American Alloys Corp., 422 F.2d 1395, 1398 (8th Cir. 1970).

With these factors in mind, the factual basis for the guilty plea by Freedom to Count Three is as follows:

A.  Element - A violation of a condition of a Clean Water Act permit occurred.

14

Facts

- At all relevant times, the NPDES Permit for the Etowah Facility contained a condition that required Freedom to develop, implement, and maintain a storm-water plan. Freedom Stipulation of Facts, p.4-5 (ECF-9 at 26-27); see also NPDES Permit at 32 (Exhibit 4).

- Freedom never developed or implemented a storm-water plan for the Etowah Facility. Freedom Stipulation of Facts, p.5, 7 (ECF-9 at 27, 29).

B. Element - The permit condition implemented sections 1311 and 1318 of Title 33, United States Code.

Facts

- The NPDES Permit condition that required a storm-water plan also required that the storm-water plan include and implement certain controls to prevent pollution, including inspection and testing of plant equipment and systems. See Freedom Stipulation of Facts, p.5 (ECF-9 at 27); NPDES Permit at 32 (Exhibit 4, requiring implementation of storm-water pollution controls).

- The NPDES Permit condition that required a storm-water plan further required that certain practices be put into place to "reduce pollutants", Freedom Stipulation of Facts, p.5 (ECF-9 at 27); NPDES Permit at 29 (Exhibit 4) (last full paragraph, "plan shall describe and ensure the implementation of practices which are to be used to reduce the pollutants in stormwater discharges associated with industrial activity at the facility and to assure compliance with the terms and conditions of [the NPDES Permit]").

- Section 1311 of Title 33, United States Code ("Effluent limitations"), makes it unlawful to discharge any pollutant except as in compliance with certain, other sections of the Clean Water Act. Accordingly, the NPDES Permit condition requiring practices to reduce pollutants in storm-water discharges and further "to assure compliance with terms and conditions of the [NPDES Permit]," NPDES Permit at 29 (Exhibit 4), implemented the governing law, that is, section 1311 of the Clean Water Act.

15

- The NPDES Permit condition requiring a storm-water plan further implemented section 1318 of the Clean Water Act, that is, 33 U.S.C. § 1318 ("Records and reports"), by stating the required storm-water plan was considered a report under "Section 308(b) of the CWA," and further requiring Freedom to make the storm-water plan available to the public. NPDES Permit at 30 (Exhibit 4).[7]

C. Element – Freedom knowingly violated the condition (by not developing and implementing the storm-water plan).

Facts

- Freedom never developed or implemented a storm-water plan for the Etowah Facility. Freedom Stipulation of Facts, p.5, 7 (ECF-9 at 27, 29).

- Certain responsible corporate officers of Freedom knew of the requirement to implement a storm-water plan. Freedom Stipulation of Facts, p.5 (ECF-9 at 27). At least one key employee also knew that Freedom had not developed a storm-water plan and had not implemented practices that would have been in a storm-water plan to ensure compliance with the NPDES Permit. Id.

- Freedom hired an engineering firm in 2002 to develop a storm-water plan. A draft storm-water, dated February 14, 2002, was prepared and submitted to Freedom, but it was never approved and signed by anyone with Freedom. Id.

- When representatives of the West Virginia Department of Environmental Protection (WVDEP) requested Freedom's storm-water plan following the MCHM discharge on January 9, 2014, the only plan that could be found was the draft storm-water plan dated February 14, 2002.

- The Freedom employee to whom the storm-water plan was submitted in February 2002 was the plant manager of the Etowah Facility. The plant manager for the Etowah Facility was an employee of Freedom who reported to Freedom's president. Freedom Stipulation of Facts, p.2 (ECF-9 at 24).

---

[7] Section 308(b) of the Clean Water Act is codified in the United States Code at 33 U.S.C. § 1318(b).

- The draft storm-water plan was stored in a file cabinet in the plant manager's office at the Etowah Facility. The plant manager therefore knew that a draft had been received but had never been formalized and implemented. Freedom thus knew that a storm-water plan had never been formally adopted and implemented as of February 2002.

The facts listed above demonstrate that Freedom failed to develop and implement a storm-water plan for the Etowah Facility. Further, Freedom had knowledge, through the knowledge of its plant manager, as of February 2002, that a storm-water plan had never been developed and implemented for the Etowah Facility. Accordingly, the facts listed above demonstrate that there is a solid factual basis for the guilty plea of Freedom to Count Three of the information.

        Respectfully submitted,

        R. BOOTH GOODWIN II
        United States Attorney
By:

        s/Philip H. Wright
        PHILIP H. WRIGHT
        Assistant United States Attorney
        WV State Bar No. 7106
        300 Virginia Street East
        Room 4000
        Charleston, WV  25301
        Telephone:  304-345-2200
        Fax:  304-347-5104
        Email: philip.wright@usdoj.gov

CERTIFICATE OF SERVICE

It is hereby certified that the foregoing "UNITED STATES MEMORANDUM REGARDING FACTUAL BASES FOR GUILTY PLEAS OF FREEDOM INDUSTRIES, INC.," has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 28th day of October 2015, to:

>Robert R. Leight, Esq.
>Pietragallo Gordon Alfano Bosick & Raspanti, LLP
>One Oxford Centre, 38th Floor
>Pittsburgh, PA  15219
>Counsel for Freedom Industries, Inc.

>s/ Philip. H. Wright____
>Philip H. Wright
>Assistant United States Attorney
>WV Bar No. 7106
>300 Virginia Street, East
>Room 4000
>Charleston, WV 25301
>Telephone:  304-345-2200
>Fax: 304-347-5104
>Email:  philip.wright@usdoj.gov